CHARLES J. SCHUCK, JUDGE,
dissenting.
An analysis of the majority opinion as rendered in this claim presents but one issue, namely, whether or not there was negligence on the part of the state agency involved. It becomes necessary, therefore, to analyze the facts as presented to the court and to determine from these facts whether or not there was negligence on the part of the guard involved, and, in my judgment further, whether there was negligence on the part of the department or agency having charge of the work in failing to have a sufficient number of guards to supervise and control the work of the convicts who were employed on the project.
As set forth in the majority opinion, the evidence shows that the quarry in question was about three hundred feet long and *75 seventy-five feet high, and it is virtually admitted that it would be impossible for an escape to have been made up over the face of the quarry. The prisoners, ten in number, were loading stone on two trucks, to be conveyed to the highway that was being improved in a nearby section of Wetzel county. The stone had been placed in piles and although there is no direct testimony of any kind as to the manner of the escape, it is assumed and maintained as a defense that the prisoners in question must have gotten behind the piles of stone and thus eventually made their escape from the project. The work of loading the stone took place about the middle of the quarry, which left at least a hundred feet of the quarry itself exposed on either side of the trucks that were being loaded, and so far as the evidence reveals, with no obstruction that would prevent a watchful guard from seeing the men if an attempt to escape was being made. The testimony fails to show definitely how long the prisoners had escaped before their absence was noted. It is assumed that a space of seven or eight minutes elapsed before their action was noted. The guard in question, William E. Phalen, maintains that the men escaped through an opening in the stone pile, but a review of his testimony reveals the fact that the stone piles in question left an open, unobstructed space of at least a hundred feet on either side through which no convict could escape without being detected or seen if the guard was exercising the degree of care necessary under the circumstances. He maintains (record p. 77) that he could not see them behind the truck that was being loaded. This fact of itself, to my notion, constituted negligence in that he ought to have placed himself so that he could have seen the prisoners at all times, or, if this is not true, and assuming that his statement is correct, then the department involved was in my judgment negligent in not supplying him a sufficient number of guards to take care of the number of prisoners that were employed on the work, and who, if Phalen’s testimony is correct, could have been working without a guard seeing them at the time.
It must be borne in mind that this was known as an armed camp, and that prisoners with long-term records, and of a *76 vicious nature, were amongst those employed at this particular work and consequently there was a higher duty devolving upon the state agency involved than would be present or required in an unarmed camp. The record shows that Phalen himself was armed with a shotgun at the time.
The witness Blake, one of the witnesses for the state agency, when asked the question (record p. 112), “Can you explain how, if a guard had been on the alert three men could have gone to one end or the other of the quarry without being seen,” replied, "It looks to me like he could have seen them all right.” Further in this connection the witness Montgomery, who was in charge of the guard, states (record p. 22) that it was the duty of the guard to keep the prisoners in view at all times. If this was the duty of the guard Phalen then he definitely violated that duty, because he has testified (record pp. 76-77) that he could not see the men behind the truck.
It is difficult to comprehend that a watchful guard could not have prevented the escape when, as he testified, he could not have been more than thirty feet away from the prisoners themselves, and they, the prisoners, could not have been more than that distance in front of him, the guard. (Record p. 76.) Either the guard was negligent in not noticing the escaping prisoners or the circumstances were such that, considering the nature of the men who were employed in this work, the state agency involved ought, beyond all question, to have employed more guards in carrying on the work. In either event it seems to me that in equity and good conscience the state should be liable for any act committed by an escaping prisoner that deprives a citizen of his right of property or who by reason of the vicious act of an escaping prisoner is so maimed as to be made a cripple for life and deprived of the means of earning his livelihood.
The project of improving our highways, under the system and plan adopted, must be commended, not only from an economic but from a social standpoint as well. The work done by reason of this plan saves many dollars for the state in bringing *77 about necessary improvements and at the same time perhaps creates a more humane manner of handling prisoners and at least, gives the prisoner who wants to be reformed an opportunity to do so in the open without being confined within the gloom of four walls. This very scheme and plan, however, carries with it certain responsibilities and obligations that must be fully discharged by the state. One of these is that in view of the very nature of the work that is carried on and the prisoners involved, the state is under obligation, at least in equity and good conscience, to protect the citizen, as well as his property, from any tort or criminal act that might be committed against him or his property by reason of the presence of these prisoners. Within reason the state must take the required and necessary precautions. It must have a sufficient number of guards, in an armed camp especially, to take every precaution to avoid escapes. It must see to it that capable, keen and alert guards are placed in charge of the work, and failing to carry out these conditions, it ought to be, in my opinion, held liable for any harm that was done to a citizen by an escaped prisoner when these requirements have not been met by the state itself.
At the close of the third to the last paragraph of the majority opinion there is this significant statement: “The guard could not reasonably have seen the men behind the truck.” Let me ask, if not, why not? I repeat, in view of this statement, either the guard was not keen and alert or a sufficient number of guards had not been supplied. In either case there was negligence which ultimately led to the deplorable and tragic injury to claimant.
Joe Yoho, safety director for the state road commission, of the district involved, who made an independent investigation of this whole affair, when asked (record p. 148) whether or not Carl F. Montgomery, who also testified, and who was the chief of the guard, had made a statement to Yoho to the effect that Phalen had been discharged for negligence, answered “Yes, Sir. He made this quotation: that he discharged guard Phalen for negligent — for negligence on line of duty relative to that escape.” This statement was afterward denied by Montgomery himself, but the fact remains, as shown on record page 165, that Mont *78 gomery, the captain, told Phalen that he would not need him on the morning of May 13, 1944, which was a week or ten days after the escape in question had taken place, and so far as this record reveals Phalen has not been employed or engaged as a guard since, and it is questionable whether or not he has any connection with the department at the present time. The witness Montgomery further testifies (record pp. 165-166) that he wanted to talk to Phalen about matters of the escape but never had an opportunity as Phalen went to his home at Cass, West Virginia, to spend a two weeks’ vacation, but he has never returned to the job as a guard. So far as the record reveals he never returned to that particular work nor is it definitely shown whether he was discharged or not or whether he was in fact acquitted of any negligent conduct in watching over the men at the quarry. All of which indicates to me rather strongly that at least to the officials in charge of the project the acts of Phalen as the quard in question were not those of a careful, prudent man, and that he should not be continued in that line of work. After the escape of the three men in question on May 3rd, he, Phalen, allowed another man to escape also.
Under all these circumstances I would make a substantial award to claimant to recompense him, to a degree, at least, for the irreparable injury he has suffered.